756 A.2d 1056 (2000)
334 N.J. Super. 77
TOLL BROTHERS, INC., a Delaware Corporation, Plaintiff-Respondent,
v.
TOWNSHIP OF WEST WINDSOR, a municipal corporation of the State of New Jersey located in Mercer County, Mayor and Council of the Township of West Windsor, and the Planning Board of the Township of West Windsor, Defendants-Respondents.
Affordable Living Corporation, Inc., a New Jersey Corporation, Plaintiff, Maneely Princeton Partnership, successor in interest to Maneely, Inc., Plaintiff/Intervenor-Appellant, Dr. and Mrs. Charles Akselrad, Plaintiffs/Intervenors,
v.
West Windsor Township, Defendant-Respondent.
Toll Brothers, Inc., a Delaware Corporation, Plaintiff-Respondent,
v.
Township of West Windsor, a municipal corporation of the State of New Jersey located in Mercer County, Mayor and Council of the Township of West Windsor, and the Planning Board of the Township of West Windsor, Defendants-Respondents.
Affordable Living Corporation, Inc., a New Jersey Corporation, Plaintiff, Maneely Princeton Partnership, successor in interest to Maneely, Inc., Plaintiff/Intervenor, Dr. and Mrs. Charles Akselrad, Plaintiffs/Intervenors-Appellants,
v.
West Windsor Township, a municipal *1057 corporation of the State of New Jersey, located in Mercer County, New Jersey, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 1, 2000.
Decided August 16, 2000.
*1060 James H. Knox, Clinton, argued the cause for appellant Maneely Princeton Partnership in A-5857-97T3 (Gebhardt & Kiefer, attorneys; Mr. Knox, of counsel and on the brief).
Paul A. Sandars, III, Roseland, argued the cause for appellants Dr. and Mrs. Charles Akselrad in A-5980-97T3 (Lum, Danzis, Drasco, Positan & Kleinberg, attorneys; Mr. Sandars and Colin M. Danzis, of counsel and on the brief with Kevin J. O'Connor).
Gerald J. Muller, Princeton, argued the cause for respondent Planning Board of the Township of West Windsor in A-5857-97T3 and A-5980-97T3 (Miller, Porter & Muller, attorneys; Mr. Muller on the joint brief).
Karen L. Cayci, Princeton, argued the cause for respondents Township of West Windsor and Mayor and Council of the Township of West Windsor in A-5857-97T3 and A-5980-97T3 (Herbert, Van Ness, Cayci and Goodell, attorneys; Ms. Cayci, on the joint brief).
Carl S. Bisgaier, Cherry Hill, argued the cause for respondent Toll Brothers, Inc. in A-5857-97T3 and A-5980-97T3 (Hill Wallack, attorneys; Henry A. Hill and Kenneth E. Meiser, Princeton, of counsel and on the brief).
Before Judges HAVEY, A.A. RODRÍGUEZ and COLLESTER. *1058
*1059 The opinion of the court was delivered by HAVEY, P.J.A.D.
This is Mount Laurel[1] litigation. Intervenors, Maneely Princeton Partnership (Maneely) and Dr. and Mrs. Charles Akselrad (Akselrad) are the owners of two tracts of land previously zoned for affordable housing as part of a 1985 settlement of an exclusionary zoning action instituted by Affordable Living Corporation against defendant West Windsor Township. Consent orders were entered in October 1985, rezoning intervenors' sites for exclusionary development as part of the overall compliance plan approved by Judge Serpentelli and incorporated into an October 1, 1985 consent judgment.
In 1997, the Township rezoned intervenors' sites to non-Mount Laurel uses, deleting them from the Township's compliance plan. On May 1, 1998, the trial court entered a conditional final judgment of compliance and repose in a builder's remedy action instituted by Toll Brothers against the Township. In that judgment the court authorized the Township to delete intervenors' sites from the compliance *1061 plan, and deemed the 1985 consent judgment "as having expired."
In these back-to-back appeals, intervenors challenge the deletion of their sites from the Township's compliance plan, arguing that the action was contrary to the rules of the Council on Affordable Housing (COAH) and violated their vested rights under the 1985 consent orders. We reverse and remand for further proceedings. In our view, Rule 4:50-1(e) provides the appropriate framework for resolution of the dispute before us. That rule allows relief from judgment where "it is no longer equitable that the judgment ... should have prospective application ...." Applying Fed.R.Civ.P. 60(b)(5) (the federal equivalent of Rule 4:50-1(e)), the federal courts have established practical and equitable standards for relief from consent judgments entered in public-interest litigation. We adopt those standards and remand with direction that they be applied in determining whether provisions of the 1985 consent orders and consent judgment affecting intervenors' properties should be vacated.

I
A detailed review of the procedural history is necessary. In March 1984, Affordable Living Corporation instituted exclusionary zoning litigation against the Township. Affordable Living and the Township reached a tentative settlement, which included plans to rezone intervenors' properties for exclusionary development. Both intervenors had other plans for the properties, and objected to the rezoning. Both Akselrad and Maneely settled with the Township. In October 1985, a consent judgment was entered which, among other things, declared the Township in compliance and granted the Township repose from further Mount Laurel litigation until July 22, 1991. At the same time, consent orders were entered delineating the rights and obligations of both Maneely and Akselrad.
In May 1993, Toll Brothers, owner of a 293-acre tract, instituted an action seeking a site-specific builder's remedy, alleging that the Township's fair-share plan was defective due to unreasonable zoning constraints, market conditions and other factors.[2] After a lengthy trial, Judge Carchman rendered a written opinion, reported at 303 N.J.Super. 518, 697 A.2d 201 (Law Div.1996), declaring the Township's zoning ordinance in violation of Mount Laurel II, and awarding Toll Brothers a builder's remedy to construct a development of single-family and multiple-family dwellings, including 175 affordable rental units.
In March 1997, intervenors received notice that the Township had proposed to delete their sites for affordable housing. Intervenors moved unsuccessfully to intervene in the action instituted by Toll Brothers. Judge Carchman advised intervenors that they should attempt to enforce whatever rights they had under the 1985 consent judgment and consent orders. However, the Affordable Living litigation, resulting in the 1985 consent judgment, was consolidated with the Toll Bros. proceedings "for limited purposes." Intervenors then moved to enforce their rights under the 1985 consent judgment and consent orders, and the motions were consolidated with the Toll Bros. litigation. After extensive testimony, the trial court rendered a written opinion and entered the May 1, 1998 conditional final judgment of compliance and order of repose. As part of that judgment, the Township was authorized to delete intervenors' sites and, as noted, treated all orders entered in the original Affordable Living litigation as "having expired." These appeals followed.

II
Maneely's site, zoned for affordable units as part of the October 1985 consent *1062 judgment, is situate directly across the street from Toll Brothers' property. Maneely's total holdings exceed 200 acres, forty-two of which are developable. Akselrad's site consists of approximately fortyfour acres, a substantial portion of which is developable.
Prior to the 1985 settlement and consent judgment, Maneely owned additional sites (sites 4 and 6) as well as the 200-acre site, the subject of this litigation (site 2). In December 1982, the Planning Board approved a development proposal (not involving the construction of affordable housing) on sites 4 and 6. However, during the Affordable Living litigation, Maneely was informed by the Township that the approval was of no force or effect. Maneely thereupon intervened in the Affordable Living litigation and filed a separate action in lieu of prerogative writs defending its preexisting rights relating to its approved sites.
Prior to the 1985 consent judgment, the Akselrad property was zoned for office building use (ROM-1). Akselrad had retained an engineering firm to perform a feasibility study for development of an office complex. He intervened in the Affordable Living litigation in order to preserve the ROM-1 zoning. It was his view that the settlement agreement between Affordable Living and the Township, rezoning his property, would depreciate its value.
In July 1985, Maneely and the Township entered into a settlement which provided in part that Maneely's 200-acre tract would be rezoned for high-density inclusionary development. The settlement was incorporated into an October 15, 1985 consent order which provided in part as follows:
No party to this action shall amend any of the terms and conditions of this order, nor shall any land use ordinances of West Windsor Township affecting Maneely lands be amended without the written consent of the other parties. In the absence of such consent, the parties shall have the right to make application to the Court for a ruling. Any changes relating to the Mt. Laurel obligation whether consented to by the parties or not, shall require a Court Order.
In 1996, a Maneely representative met with John Madden, the Township Planner, and the Township's Director of Community Development, at which time Madden asked Maneely to submit a preliminary proposal for affordable housing. Thereafter, Maneely reached a tentative agreement with Orleans Builders, an experienced developer of multi-family housing, including affordable housing, to build 308 townhouses on the site, with a twentypercent set-aside. Jerry Orleans, Chairman of Orleans Builders, testified that he was "absolutely certain" that a strong market would exist for the 308 townhouses proposed to be developed on Maneely's site. He cautioned that the only way to provide sewer service to the project was through a pump station. Timothy Boylan, a Maneely representative, testified that an agreement existed with Toll Brothers whereby Maneely's property could have sewer access once Toll Brothers developed its contiguous site. Boylan conceded that there had been no discussion between Maneely and Toll Brothers about accessing Maneely's site through the pump stations Toll Brothers intended to construct on its site.
Akselrad also settled with the Township. The October 1, 1995 consent order, incorporating the settlement, reserved fifteen acres of the tract as ROM-1 to accommodate an office complex of 120,000 square feet. The remainder of the tract was to be rezoned for inclusionary development. If the Township's fair-share obligation was to be reduced, Akselrad was to have a "right of first removal," under which he could opt out of any obligation to build affordable housing by paying the Township's affordable housing trust fund a sum of $3,300 per low or moderate income unit removed from the compliance plan. As was the case with Maneely, the consent *1063 order precluded changing the terms of the agreement as follows:
FURTHER ORDERED that no party to this action shall amend any of the terms, conditions, provisions, rights, obligations, etc. contained in this Order, nor shall any land use Ordinances of West Windsor Township which affect the Akselrads' tract (the ROM-1 portion and/or the re-zoned R4B portion) be enacted without the written consent of all parties, and in the absence of such consent, the parties hereto shall have the right to make application to the Court for appropriate relief.
In 1987, Akselrad submitted a proposed office complex plan to the Planning Board, but with no sewer, plans could not proceed. In 1995, Akselrad learned that sewer facilities might become available through the south branch of the Duck Pond Run interceptor, resulting from the planned commercial development of adjacent property. In August 1995, Akselrad contracted to sell the property to Westminster Realty, the proposed developer of the nearby Copperfield/Windsor Ponds development. In November 1996, a month after Judge Carchman rendered his opinion in the Toll Bros. litigation, Westminster submitted a concept plan to the Planning Board for a development of 352 dwelling units in several three-story buildings, including seventytwo affordable units.
After receiving Judge Carchman's opinion, Township officials undertook a comprehensive reevaluation of the compliance plan. According to Madden, the Township decided it needed "new goals and a new approach." He stated that the Township decided to facilitate only "projects that were in the pipe line, the approval pipe line," and removed sites that were not capable of generating affordable unit credits. Accordingly, in March 1997, the land use element of the master plan was amended to delete intervenors' sites, as well as others, because, according to Madden, Judge Carchman had questioned the viability of these sites for inclusionary development. Madden also explained that the Township wanted to move "away from reliance on the use of inclusionary housing projects with its large market-price housing component" in favor of "more direct methods of producing affordable housing such as non-residential zoning incentives, regional contribution agreements, and municipal or non-profit housing sponsorship." The amended land use element recommended rezoning of the sites for research, office, and manufacturing.

III
Intervenors contend that they were indispensable parties under Rule 4:28-1, and should have been joined either at the commencement of the Toll Bros. litigation or, at the latest, when the Township revised its plan in 1997 to delete their sites.
Mandatory joinder is governed by Rule 4:28-1(a):
(a) Persons to be Joined if Feasible. A person who is subject to service of process shall be joined as a party to the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest in the subject of the action and is so situated that the disposition of the action in the person's absence may either (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or other inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant.
Whether a party is indispensable is a fact-sensitive issue. Allen B. DuMont Labs., Inc. v. Marcalus Mfg. Co., 30 N.J. 290, 298, 152 A.2d 841 (1959). "As a general proposition, it seems accurate to say that a party is not truly indispensable unless *1064 he has an interest inevitably involved in the subject matter before the court and a judgment cannot justly be made between the litigants without either adjudging or necessarily affecting the absentee's interest." Ibid. Accord Cogdell v. Hospital Ctr. at Orange, 116 N.J. 7, 18, 560 A.2d 1169 (1989). Moreover, absence of an indispensable party does not deprive the court of jurisdiction to adjudicate the issues among the parties who were joined. Raynor v. Raynor, 319 N.J.Super. 591, 602, 726 A.2d 280 (App.Div.1999); Ross v. Ross, 308 N.J.Super. 132, 144, 705 A.2d 784 (App.Div.1998).
In the present case, Judge Carchman denied Maneely's motion to intervene as a party because it would complicate the litigated issues in the Toll Bros. case, and because Maneely's rights were derived solely from the 1985 consent judgment and consent orders. However, he recognized that intervenors had rights that were worthy of protection, and he consolidated the cases for the "limited purpose" of allowing them to press those rights during the final phase of the case.
We disagree with intervenors that they were indispensable parties at the outset of the litigation. In 1993, neither the parties nor the court had any reason to believe that the outcome of the Toll Bros. suit would affect in any way the Maneely or Akselrad tracts. Throughout the trial in the Toll Bros. litigation, defendants vigorously defended the inclusion of those two sites as part of the compliance plan. Toll Brothers never suggested that granting it complete relief would in any way impact the sites. Indeed, at oral argument before Judge Carchman, counsel for Maneely conceded as much, saying that "no one should have known" that Maneely was an indispensable party when Toll Brothers filed suit.
When the Township decided to delete the sites, both intervenors had timely notice and filed protests. Their concerns were fully aired in the proceedings before the trial court. Their rights derived solely from the 1985 consent judgment and ancillary orders, and the trial court accorded them every opportunity to vindicate the rights under the judgment. Historically, parties to Mount Laurel consent judgments have sought to protect their rights, as here, through motions to enforce litigants' rights. R. 1:10-3. See Morris County Fair Hous. Council v. Boonton Township, 228 N.J.Super. 635, 640, 550 A.2d 777 (Law Div.1988); Morris County Fair Hous. Council v. Boonton Township, 220 N.J.Super. 388, 394, 532 A.2d 280 (Law Div.1987), aff'd as modified, 230 N.J.Super. 345, 553 A.2d 814 (App.Div.1989). Intervenors have failed to articulate the manner in which they were prejudiced by not being made parties to the Toll Bros. litigation. In short, intervenors were not indispensable parties.

IV
Maneely contends that the parties in the Toll Bros. litigation followed the wrong procedure. According to Maneely, the Township should have sought substantive certification from COAH, or Toll Brothers should have brought a motion to amend the 1985 settlement, rather than bringing an entirely new action. Maneely claims that Judge Carchman should not have tried the Toll Bros. action, but instead should have "insisted that the matter be handled by COAH as an administrative proceeding, or in the alternative [the judge] should have taken cognizance of the matter but referred it to COAH for the purposes of appropriate hearings." Maneely urges court to remand the "matter" to the trial court or to COAH. We reject the arguments.
Maneely misconceives the COAH process. Under the COAH rules, a municipality may invoke the administrative process. N.J.A.C. 5:91-2.1. If a developer brings an exclusionary zoning lawsuit before a municipality files with COAH, then COAH will accept jurisdiction only on transfer by the court. Ibid. A municipality *1065 has the option to adopt a fair-share plan that conforms to COAH regulations or take its chances in court, with the possible consequence of a builder's remedy. N.J.S.A. 52:27D-309(b); N.J.S.A. 52:27D316(b); Hills Dev. Co. v. Bernards Township, 103 N.J. 1, 35-36, 510 A.2d 621 (1986); Fair Share Hous. Ctr., Inc. v. Cherry Hill Township, 242 N.J.Super. 76, 81, 576 A.2d 24 (App.Div.1990). COAH can only act through mediation; if compromise fails, then COAH sends a transferred case back to the courts. Fair Share Hous. Ctr., Inc., supra, 242 N.J.Super. at 81-82, 576 A.2d 24.
Here, the Township decided to take its chances in court. Since the Township vigorously opposed conventional single-family zoning for the Toll Brothers' property, it would have had no reason to seek a transfer, since COAH had adopted a regulation directly contrary to the Township's position. See N.J.A.C. 5:93-5.6(b)(2). We therefore disagree with Maneely's argument that the "correct procedure" would have been for the Township to file a resolution of participation with COAH, and then have COAH mediate the Township's dispute with Toll Brothers.
Maneely also argues that Toll Brothers should have sought to amend the prior settlement rather than bring a new action to declare the ordinance invalid and for a builder's remedy. Maneely, of course, has no standing to dictate Toll Brothers' litigation strategy. Further, Maneely overlooks the fact that, under the 1985 settlement, Toll Brothers had no right to build conventional single-family dwellings on small lots. Toll Brothers obviously believed that the zoning ordinances implemented pursuant to the settlement failed to create a realistic opportunity, and thus it would have been pointless for Toll Brothers to seek enforcement of or amend the settlement. Maneely's allegations concerning procedural error are without merit.

V
The central issue raised by this appeal is whether the trial court erred in eliminating intervenors' rights under the 1985 consent judgment. Intervenors argue that: (1) the consent judgment itself did not expire after the six years of repose (on July 1991); (2) relief from the judgment should be governed by Rule 4:50-1(e); and (3) the Township is estopped from repudiating its obligations under the 1985 judgment. Defendants respond that the zoning settlements, incorporated in the 1985 consent judgment and consent orders, are contrary to public policy as a form of "contract zoning." Alternatively, they argue that the 1985 judgment expired after six years, and in any event, as the trial court observed, the settlements are "outmoded."
Preliminarily, we reject defendants' argument that the 1985 consent judgment and consent orders represented a species of contract zoning. Courts have the power to approve a settlement in an exclusionary case, provided certain procedures are followed to ensure that the interests of low and moderate income households are adequately protected. East/West Venture v. Borough of Fort Lee, 286 N.J.Super. 311, 328, 669 A.2d 260 (App.Div.1996); Morris County Fair Hous. Council v. Boonton Township, 197 N.J.Super. 359, 366, 484 A.2d 1302 (Law Div.1984), aff'd, 209 N.J.Super. 108, 506 A.2d 1284 (App.Div.1986). Such settlements have been recognized and tacitly approved by both the Legislature, N.J.S.A. 52:27D-322, and the Court, Hills Dev. Co., supra, 103 N.J. at 64, 510 A.2d 621. Contract zoning is illegal when, pursuant to an agreement, the municipality rezones property without complying with prescribed procedures for amending the master plan and zoning ordinance. Livingston Builders, Inc. v. Livingston Township, 309 N.J.Super. 370, 381-82, 707 A.2d 186 (App.Div.1998). Properly supervised Mount Laurel settlements resulting in a consent judgment do not involve illegal contract *1066 zoning. Ibid. Nothing in Warner Co. v. Sutton, 274 N.J.Super. 464, 483, 644 A.2d 656 (App.Div.1994), cited by defendants, holds to the contrary.
We also reject defendants' contention that Mount Laurel judgments expire after six years. Rather, consent judgments in exclusionary zoning litigation effectively protect municipalities from Mount Laurel litigation for six years. Mount Laurel II, supra, 92 N.J. at 291-92, 456 A.2d 390. Accord N.J.S.A. 52:27D-322. Analogously, fair-share plans substantively certified by COAH enjoy a presumption of validity. N.J.S.A. 52:27D-317(a). Neither Mount Laurel II nor the legislation implementing the doctrine suggests that Mount Laurel consent judgments expire at the end of six years. Ordinarily, parties have a right to rely on a judgment. West Jersey Title & Guar. Co. v. Industrial Trust Co., 27 N.J. 144, 150, 141 A.2d 782 (1958). If the judgments themselves expired after six years, municipal defendants would have every incentive to delay approval of inclusionary developments or other unpopular affordable housing plans.
In holding that the Township had the right to vary the terms of the 1985 consent judgment and consent orders by deleting intervenors' sites, the trial court found support in County of Morris v. Riverview Condominiums, Inc., 304 N.J.Super. 322, 700 A.2d 884 (App.Div.1997), certif. denied, 152 N.J. 364, 704 A.2d 1299 (1998), where we affirmed orders holding that the municipality had substantially complied with a consent judgment and allowing transfer of the case to COAH. In that case, a settlement between the municipality and publicinterest plaintiffs (no developers were involved) called for inclusionary zoning on several tracts, including a site which the County sought, years after the settlement, for purposes of constructing a much-needed jail. Id. at 326, 700 A.2d 884. The settlement contemplated that some of the sites might cease to be available for inclusionary development and if that happened, the municipality could, upon written notice to and with the approval of the plaintiffs, rezone sufficient other land to make it realistically likely that the municipality would meet its fair share. Id. at 325, 700 A.2d 884. The owner of the site in question contracted to sell the property to the County for a jail, rather than build affordable housing. Id. at 326, 700 A.2d 884.
The County filed suit against the Township and the original plaintiffs for a judgment declaring that it had the right to build a jail on the site. The public-interest defendants asked the court to enforce the original judgment, or alternatively at least that section of the consent judgment requiring the Township to rezone another site. Id. at 327, 700 A.2d 884. The Township wanted the court to declare that it had complied with its obligations under the settlement, and to authorize the municipality to seek substantive certification for COAH.
The key to Morris County was a decline in the municipality's fair share. The 1984 consent judgment established the Township's fair share at 535 affordable units. See Morris County, supra, 228 N.J.Super. at 638, 550 A.2d 777. COAH's second-cycle regulations fixed the Township's 1987-99 fair share at 324 units. Morris County, supra, 304 N.J.Super. at 333, 700 A.2d 884. By the time Judge Stanton heard the case, the activities undertaken pursuant to the settlement had resulted in a 355-unit credit, more than the municipality's current fair share. Ibid.
It was under these circumstances that Judge Stanton held that the consent judgment had achieved its fundamental purpose, and thus there was no reason to literally enforce those provisions calling for the Township to rezone another tract of land if the County acquired the one site for a jail. Id. at 332-33, 700 A.2d 884. In affirming, substantially for the reasons stated by Judge Stanton, we stressed that the trial court had not modified the judgment, but rather had declined to alter its *1067 terms, and therefore Rule 4:50-1 did not apply. Id. at 334-35, 700 A.2d 884.
Morris County is distinguishable. Here we have a clear alteration of a prior consent judgment and consent orders. Intervenors were parties to that judgment and those orders and their rights under them have been effectively extinguished, whereas in Morris County the interests of all the original parties to the consent judgment had been largely vindicated over intervening years. No builder in that case objected to the deletion of its property, and the public-interest plaintiffs had achieved their goalthe municipality's complete satisfaction of its fair share. In short, the judgment had achieved its purpose. Here, on the other hand, the 1985 consent judgment brought about construction of only a small percentage of the Township's fair share.
The trial judge also cited the following passage from Hills Dev. Co. as supportive of the general policy that the rights of developers are subordinate to those of the intended beneficiaries of the Mount Laurel doctrine, low and moderate income families:
Nevertheless there is an obvious basis to a builder's claim that pursuit of this litigation was justifiable, but if that suggestion is intended to create the image of an estoppel, there is no substance to it. If there is any class of litigant that knows of the uncertainties of litigation, it is the builders. They, more than any other group, have walked the rough, uneven, unpredictable path through planning boards, boards of adjustments, permits, approvals, conditions, lawsuits, appeals, affirmances, reversals, and in between all of these, changes in both statutory and decisional law that can turn a case upside down. No builder with the slightest amount of experience could have relied on the remedies provided in Mount Laurel II in the sense of justifiably believing that they would not be changed, or that any change would not apply to the builders. If ever any doctrine and any remedy appeared susceptible to change, it was that decision and its remedy. The opinion itself constituted the strongest possible entreaty for legislative change.
[Hills Dev. Co., supra, 103 N.J. at 55, 510 A.2d 621.]
Accord Van Dalen v. Washington Township, 120 N.J. 234, 249, 576 A.2d 819 (1990). However, the quotation arises in a different context. In Hills Dev. Co., supra, 103 N.J. at 54-55, 510 A.2d 621, the Court was responding to the arguments of builders that it would be manifestly unjust to apply the transfer-of-pending-cases section of the FHA, N.J.S.A. 52:27D-316, to those builders who had expended substantial sums of money on Mount Laurel litigation that had yet to proceed to a final judgment. The Court held that the intent of the FHA, to resolve affordable housing disputes through mediation rather than litigation, outweighed the interest of builders who had pursued exclusionary zoning litigation, and thus such cases ordinarily should be transferred. Id. at 55, 510 A.2d 621. Here, Maneely's and Akselrad's rights are secured in a final judgment and the municipality has not at any time invoked COAH's jurisdiction. Where a municipality declines to submit to the COAH process, it is subject to Mount Laurel litigation, including the builder's remedy. Id. at 35-36, 510 A.2d 621. We have found no support for the proposition that developers' rights embodied in a final consent judgment can be divested simply because the municipality prefers a different fairshare plan.
The trial court correctly cited Allan-Deane Corp. v. Bedminster Township, 205 N.J.Super. 87, 132, 500 A.2d 49 (Law Div.1985), and J.W. Field Co., Inc. v. Franklin Township, 204 N.J.Super. 445, 468, 499 A.2d 251 (Law Div.1985), for the proposition that a court should accord municipalities a great deal of flexibility in designing fair-share plans. As Judge Serpentelli stated: "It is imperative that the court not substitute its judgment concerning the reasonableness of the compliance *1068 ordinance for that of a well reasoned and soundly conceived municipal plan where more than one reasonable alternative exists." Allan-Deane, supra, 205 N.J.Super. at 132, 500 A.2d 49. However, that proposition applied "absent a builder's remedy." Id. at 114, 500 A.2d 49. Here the consent judgment, while arguably not awarding a builder's remedy, conferred certain rights on all of the parties to it.
We hold that the question of whether the 1985 consent judgment and consent orders should be modified is governed by Rule 4:50-1(e) which allows relief where the "judgment or order has been satisfied, released or discharged, or a prior judgment or order upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment or order should have prospective application." Relying on Housing Auth. v. Little, 135 N.J. 274, 285, 639 A.2d 286 (1994), Akselrad argues that relief under this section is available only upon the showing that continued enforcement would result in a grave injustice. In Housing Auth., the Court, relying on federal case law, construed Rule 4:50-1(e) to require the moving party to demonstrate "extreme" or "unexpected" hardship. Ibid. However, the Court so held in the context of a judgment of possession in a landlord-tenant case. The judgment was by default, not the product of a consent decree, nor did it call for continued jurisdiction by the trial court over the performance of the terms of the judgment.
Moreover, in imposing the "extreme" or "unexpected" hardship standard, the Court in Housing Auth. relied on a line of federal cases rooted in the holding of United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999, 1008 (1932), in which the United States Supreme Court held that to vacate a consent decree in an anti-trust case the movant must make a "clear showing of grievous wrong evoked by new and unforeseen conditions ...."
However, since Swift, the United States Supreme Court has developed a new standard for modifying judgments in public-interest litigation which call for continued judicial oversight such as those entered in prisoners' rights litigation, desegregation cases, or employment discrimination litigation. See Agostini v. Felton, 521 U.S. 203, 215, 117 S.Ct. 1997, 2006, 138 L.Ed.2d 391, 409 (1997); Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378, 112 S.Ct. 748, 757, 116 L.Ed.2d 867, 883 (1992); Board of Educ. v. Dowell, 498 U.S. 237, 248, 111 S.Ct. 630, 637, 112 L.Ed.2d 715, 728 (1991). In Dowell, the Court held that the lower courts erred in relying on Swift in refusing to vacate or modify a fully litigated desegregation order. Id. at 498 U.S. 246, 111 S.Ct. at 636, 112 L.Ed.2d at 728. Starting with the premise that school desegregation decrees are not intended to operate in perpetuity, the Court held that "Swift does not provide the proper standard to apply to injunctions" in such cases. Ibid.
In Rufo, a prisoners' rights case, the sheriff sought to modify a consent decree's restriction to one prisoner in a cell to allow double-bunking, based on (1) an unforeseen increase in the inmate population and (2) a Supreme Court opinion delivered after the consent decree which allowed two prisoners per cell. 502 U.S. at 376, 112 S.Ct. at 756, 116 L.Ed.2d at 881. In holding that the motion should be governed by Fed.R.Civ.P. 60(b)(5), the federal equivalent of R. 4:50-1(e),[3] the Court reasoned:
There is no suggestion in these cases that a consent decree is not subject to Rule 60(b). A consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be *1069 reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.
[502 U.S. at 378, 112 S.Ct. at 757, 116 L.Ed.2d at 883.]
The Court followed Dowell`s lead and held that the Swift test should not be applied to any motion to modify a consent decree I entered in institutional reform litigation. Id. at 502 U.S. 380-81, 112 S.Ct. at 757-58, 116 L.Ed.2d at 884. The Court reasoned:
There is thus little basis for concluding that Rule 60(b) misread the Swift opinion and intended that modifications of consent decrees in all cases were to be governed by the standard actually applied in Swift. That Rule, in providing that, on such terms as are just, a party may be relieved from a final judgment or decree where it is no longer equitable that the judgment have prospective application, permits a less stringent, more flexible standard.
The upsurge in institutional reform litigation since Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), has made the ability of a district court to modify a decree in response to changed circumstances all the more important. Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased.

[Ibid.]
Experience had shown that "a flexible approach is often essential to achieving the goals of reform litigation ...." Id. at 502 U.S. 381, 112 S.Ct. at 752, 116 L.Ed.2d at 884.
Rufo holds that "a party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." Id. at 502 U.S. 393, 112 S.Ct. at 765, 116 L.Ed.2d at 892. The factual changes which may warrant modification include conditions which make compliance with the decree substantially more onerous, when a decree proves to be unworkable because of unforeseen obstacles, or where enforcement without modification would be detrimental to the public interest. Id. at 502 U.S. 384, 112 S.Ct. at 760, 116 L.Ed.2d at 886-87. The factual changes need not be limited to those which were both unforeseen and unforeseeable. Id. at 502 U.S. 385, 112 S.Ct. 760, 116 L.Ed.2d at 887. "Ordinarily, however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." Ibid.
A change in law warrants modification where a statute or court decision "has changed to make legal what the decree was designed to prevent." Id. at 502 U.S. 388, 112 S.Ct. at 748, 116 L.Ed.2d at 888. However, the moving party may be held to the agreement even if it requires the party to do more than what would be minimally required by the change in law. Id. at 502 U.S. 389, 112 S.Ct. at 762, 116 L.Ed.2d at 889. A mere clarification in the law does not in itself justify relief; to hold otherwise "would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in institutional reform litigation." Id. at 502 U.S. 390-91, 112 S.Ct. at 764, 116 L.Ed.2d at 890.
Finally, "[o]nce a moving party has met its burden of establishing either a change in fact or in law warranting modification of a consent decree, the district court should determine whether the proposed modification is suitably tailored to the changed circumstance." Id. at 502 U.S. 393, 112 S.Ct. at 765, 116 L.Ed.2d at 892. "A proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor." Id. at 502 U.S. 391, 112 S.Ct. at 764, 116 L.Ed.2d at 891.
The Rufo standards apply equally to proceedings to terminate a consent decree. *1070 Gonzales v. Galvin, 151 F.3d 526, 531 (6th Cir.1998); Alexander v. Britt, 89 F.3d 194, 197 (4th Cir.1996).
Factors to be considered include (1) any specific terms providing for continued supervision and jurisdiction over the consent decree; (2) the consent decree's underlying goals; (3) whether there has been compliance with prior court orders; (4) whether defendants made a good faith effort to comply; (5) the length of time the consent decree has been in effect; and (6) the continuing efficacy of the consent decree's enforcement.
[Gonzales v. Galvin, supra, 151 F.3d at 531.]
There are sound reasons for holding that intervenors' continued rights under the 1985 consent judgment and consent orders should be governed by a Rufo analysis. In Mount Laurel II, supra, 92 N.J. at 288-89, 456 A.2d 390, the Court characterized exclusionary zoning lawsuits as analogous to institutional litigation or public-interest litigation. Further, when Judge Skillman sought to define the procedure for settling exclusionary zoning cases, he looked to federal case law governing representative actions, such as school desegregation or class action employment discrimination litigation. Morris County Fair Hous. Council, supra, 197 N.J.Super. at 369-70, 484 A.2d 1302. Similarly, it would be appropriate to examine federal case law for the proper standards to modify or terminate a Mount Laurel consent decree. Also, in interpreting Rule 4:50-1, our courts have historically relied upon federal case law construing Fed.R.Civ.P. 60. Housing Auth., supra, 135 N.J. at 285, 639 A.2d 286; Baumann v. Marinaro, 95 N.J. 380, 392, 471 A.2d 395(1984); Hodgson v. Applegate, 31 N.J. 29, 35, 155 A.2d 97 (1959).
We therefore reverse and remand for reconsideration. Consistent with analogous federal precedent, see Rufo, supra, 502 U.S. at 378-80, 112 S.Ct. at 757-59, 116 L.Ed.2d at 882-83, the rights and liabilities of the parties should be reviewed under the rubric of Rule 4:50-1(e). The central core of the analysis, of course, must be whether intervenors' sites are presently suitable for Mount Laurel housing. Because the sites were included in the compliance plan embodied in the 1985 consent judgment, the Township must demonstrate significant change in facts or applicable law warranting revision of the consent judgment and orders, and that removal of the sites from the plan is "suitably tailored to the changed circumstance." Id. at 502 U.S. 393, 112 S.Ct. at 765, 116 L.Ed.2d at 892. The trial court must consider factual changes, if any, which make inclusion of the sites in the compliance plan more onerous, or unworkable because of unforeseen circumstances, or any present conditions or other facts which, if the 1985 consent judgment and orders are enforced without modification, would cause detriment to the public interest. Id. at 502 U.S. 384, 112 S.Ct. at 760, 116 L.Ed.2d at 886-87. Without intending to limit the scope of the remand hearing, we make the following observations concerning some factors we deem relevant.
First, COAH's adoption of first-cycle and second-cycle regulations constitutes a significant change in law, as was recognized by Judge Stanton in County of Morris, supra, 304 N.J.Super. at 329-33, 700 A.2d 884. Those regulations cut both ways. On the one hand, the Township's fair share has been significantly reduced below that originally fixed in the October 1, 1985 consent judgment. On the other hand, all parties to the judgment anticipated a possible reduction, which ordinarily augers against modification. Rufo, supra, 502 U.S. at 385, 112 S.Ct. at 760, 116 L.Ed.2d at 887.
Moreover, certain COAH regulations would support a modification of some portions of the settlement, whereas others favor preservation of current zoning for the Maneely and Akselrad tracts. For example, the trial court was particularly troubled by the opt-out provision in the Akselrad settlement, under which the developer *1071 would be permitted to substitute a market unit for each affordable unit by paying the Township the sum of $3,300 per unit. This is clearly inconsistent with current COAH policy, which provides:
Municipalities may allow developers of sites zoned for inclusionary development to pay a fee in lieu of building low and moderate income units, provided the Council determines the municipal housing element and fair share plan provides a realistic opportunity for addressing the municipal fair share obligation. The fee may equal the cost of subsidizing the low and moderate income units that are replaced by the development fee. For example, an inclusionary development may include a 20 percent set-aside, no set-aside and a fee that is the equivalent of a 20 percent set-aside or a combination of a fee and set-aside that is the equivalent of a 20 percent set-aside.
[N.J.A.C. 5:93-8.10(c) (emphasis added).]
In 1992, COAH clarified that $20,000 is the average internal subsidy for the set-aside units in an inclusionary development. 24 N.J.R. 238 (Jan. 21, 1992). That figure is also the minimum amount acceptable for a Regional Contribution Agreement (RCA). See N.J.A.C. 5:93-6.5(b). A court could conclude that the $3,300 per unit opt-out provision is no longer equitable and should therefore be stricken under Rule 4:50-1(e).
On the other hand, the COAH policy that sites previously zoned for inclusionary development as part of a negotiated settlement in court be retained, N.J.A.C. 5:93-5.13(b)(1), favors preserving the inclusionary zoning for the two tracts.[4] The trial court held that this COAH rule does not apply to court proceedings or, if it did apply, it only protects sites of developers who obtained a builder's remedy or were a proximate cause of bring the municipality into compliance. We disagree. The obvious purpose of this rule was to provide protection to owners of sites previously designated by the municipality as suitable for inclusionary development. See 26 N.J.R. 306 (June 6,1994), 27 N.J.R. 2135 (June 5, 1995). The preservation of inclusionary zoning on sites part of a negotiated court settlement represents COAH policy, and this policy should be followed in exclusionary zoning litigation. The Court has recognized that the judiciary has a "continuing role" in exclusionary cases, and the judiciary should conform its decisions wherever possible to COAH guidelines and policy. Hills Dev. Co., supra, 103 N.J. at 63, 510 A.2d 621. We view COAH policy as a primary factor to be considered in determining whether the 1985 consent judgment and consent orders should be modified or terminated. Moreover, the rule is not limited to developers who secure a builder's remedy. Rather it applies to sites that were "part of a negotiated settlement in court." N.J.A.C. 5:93-5.13(b)(1). Further, both intervenors played a significant role in bringing about the consent judgment; without their consent, it is doubtful whether any settlement could have been achieved.
However, N.J.A.C. 5:93-3.5(a) provides that:
Where land has been zoned for low and moderate income housing, the Council shall review sites for suitability and determine if the previously zoned sites present a realistic opportunity for low and moderate income housing before granting a reduction.
Implicit in this rule is the underlying policy that sites that do not create a realistic opportunity for the construction of affordable housing should not be zoned for that purpose. In this respect, the hearing on remand should focus on whether the two sites can be sewered at a reasonable cost. The trial court found that there are "serious issues related to the developability of *1072 [the two sites] based on the availability of sewers." It would appear that the 1985 consent judgment assumed that the two sites could be developed for affordable housing; if that assumption is proven to be incorrect, it may warrant relief from the consent judgment and consent orders.
In urging that the Township should no longer be bound by the 1985 judgment, defendants point to the trial court's findings and conclusions concerning Maneely's and Akselrad's lengthy delay in enforcing their rights under the judgment. The court noted that Maneely did not take any steps to develop its site until June 1996, eleven years after entry of the judgment, and that Akselrad did nothing until November 1996, when it submitted a concept plan for affordable housing. The trial court concluded that the Township
should not be required to keep in place sites which have not developed for twelve years, which do not have necessary infrastructure available, and which, most important, are unnecessary in light of West Windsor's comprehensive planning effort to put in place a program which will actually achieve compliance through units in the ground.
However, there are other factors which should be considered on the delay issue. First, as Judge Carchman noted in Toll Bros., only two of the eleven sites zoned for affordable housing in the 1985 fair share plan resulted in any development. Toll Bros., supra, 303 N.J.Super. at 531-32, 697 A.2d 201. Judge Carchman found that the Township's compliance record compared unfavorably with comparably situated municipalities, attributable in part to public resistance to implementing the fair-share plan and the Township's sewer policies. Id. at 534-36, 697 A.2d 201. The delay may also have been attributable to general economic conditions, including the absence of a market for multi-family housing in the late 1980's and early 1990's. It should also be noted that the Legislature recognized the crisis in the housing industry, leading it to adopt the Permit Extension Act, L. 1992, c. 82. N.J.S.A. 40:55D131(a). See, generally, MCG Assocs. v. Department of Envtl. Protection, 278 N.J.Super. 108, 126, 650 A.2d 797 (App.Div.1994). It may be that during this time neither Maneely nor Akselrad had any reason to believe that the passage of time threatened its rights under the 1985 judgment, especially since in the Toll Bros. litigation the Township had vigorously defended their sites as appropriate for inclusionary zoning.
Finally, defendants contend that the settlement reserved the right of the parties to apply to the court for a ruling on issues on which they could not agree. In other words, defendants only needed the court's permission to rezone. Akselrad responds that the provision in the consent judgment allowing the court to resolve disputes did not apply to rezoning property, but only to other matters.
Paragraph four of the October 1, 1985, consent judgment of compliance authorized the Township to reduce its fair share or phase in lower income units subject to court approval:
Notwithstanding the above no party shall amend any of the terms and conditions of this order, nor shall any land use ordinances of West Windsor Township affecting the lands of plaintiffs be amended without the written consent of the plaintiffs. Neither a reduction of the fair share, nor an approved phasing schedule shall affect plaintiffs' lands absent their consent. In the absence of consent on other matters, the parties shall have the right to make application to the Court for a ruling.
[Emphasis added.]
We agree with Akselrad that the above passage suggests that rezoning plaintiffs' property was not an issue that the parties intended to submit to the court. Since rezoning was not an issue that the parties reserved for court review, we agree with Akselrad's argument that his rights could *1073 only be abrogated through a Rule 4:50-1 motion.
On the other hand, the October 1, 1985, "Order Entering Settlement Nunc Pro Tunc" appears to call for court review on all issues on which the parties could not agree. The final paragraph states that "nor shall any land use Ordinances ... which affect the Akselrads' tract ... be enacted without the written consent of all parties, and in the absence of such consent, the parties hereto shall have the right to make application to the Court for appropriate relief." Maneely's October 15, 1985, consent judgment contains the same terms, at least as applied to site 2. The provisions relating to sites 4 and 6 are silent on the rezoning issue.
Thus, it can be said that the judgment of compliance and the two consent orders (relating to the intervenors' settlement) are inconsistent. The two consent orders suggest that, if the parties disagreed on rezoning, either party had the right to bring the issue before the court. The final consent judgment on the other hand, suggests that the rezoning was to remain fixed, and only other matters were subject to court review. In either event, the Law Division has jurisdiction to enforce or modify the 1985 order.
In our view, that apparent conflict must be resolved by construing the consent orders affecting intervenors' sites as requiring defendants to demonstrate a right to relief under Rule 4:50-1(e) and the Rufo analysis. The terms of the consent judgment of compliance and the consent orders affecting intervenors' sites are interrelated, making up an integrated compliance scheme. The court's exercise of broad discretion in rezoning intervenors' sites would clearly disturb the court-approved balance crafted by the judgment of compliance.
A final comment. The trial court expressed concern that keeping the Maneely and Akselrad tracts in the compliance plan would result in the Township zoning for more than its fair share. The court agreed that a municipality need not zone for more than its fair share in order to be entitled to a judgment of compliance and repose, a conclusion shared by Lynch.
Toll Brothers points out that requiring a municipality to zone for more than its fair share, known as "overzoning," was a commonly employed remedy where there was some doubt as to whether the selected sites would actually produce the predicted amount of affordable housing. Mount Laurel II, supra, 92 N.J. at 270, 456 A.2d 390; Oakwood at Madison, Inc. v. Madison Township, 72 N.J. 481, 519, 371 A.2d 1192 (1977); Toll Bros., supra, 303 N.J.Super. at 542, 697 A.2d 201; Allan-Deane, supra, 205 N.J.Super. at 142-45, 500 A.2d 49; Urban League v. Mahwah Township, 207 N.J.Super. 169, 195, 504 A.2d 66 (Law Div.1984). Maneely responds that "Toll is making the resolution of this problem more complicated than it needs to be" since the Township could delete some of the previously selected sites or mechanisms for achieving compliance, such as the proposed RCA with the City of Trenton. Thus, argues Maneely, requiring the Township to put its site back into the plan would not create any undue hardship.
Although ample precedent exists for overzoning under cases decided prior to the enactment of the FHA and promulgation of COAH rules, nothing in the current COAH regulations sanctions or requires that approach. That is probably because COAH regulations are designed to ensure that sites selected for affordable housing are indeed realistic. But any hardship in this case is of the Township's own making. It could have, and probably should have, sought a judicial declaration regarding the continued vitality of the 1985 consent judgment before committing itself to other compliance measures. The possibility that the court, on remand, could order continued inclusion of the Maneely and Akselrad sites, which in turn could possibly result in the Township zoning for more than its fair share, is not in itself *1074 grounds for terminating the prior consent judgment. We specifically reject defendants' claim that if the Maneely and Akselrad sites are to be included in the affordable housing program, then defendants are entitled to reduce or eliminate the Toll Brothers project. Toll Brothers responds that there is "absolutely no basis in law or in fact for such an assertion." We agree. There is no authority for eliminating Toll Brothers' builder's remedy even if the Township must include the Akselrad and Maneely sites.
Reversed and remanded for further proceedings.
NOTES
[1] Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel, 67 N.J. 151, 336 A.2d 713, appeal dismissed and cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975) (Mount Laurel I); Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel, 92 N.J. 158, 456 A.2d 390 (1983) (Mount Laurel II).
[2] At the time of the filing of Toll Brothers' complaint, the Township was not protected by either the judgment of repose or substantive certification granted by COAH. See N.J.A.C. 5:92-1.6(d); N.J.A.C. 5:91-14.
[3] Fed.R.Civ.P. 60(b)(5) permits relief when "the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application."
[4] The Township's challenge to the validity of this rule was rejected by us as clearly without merit by our opinion in In re Adoption of N.J.A.C. 5:93-1 to -13.4, No. A-6149-93 (App. Div. June 10, 1996).